# THE SUPREME COURT

OF

## PENNSYLVANIA.

### DECIDED AT APRIL TERM, 1861.

EASTERN DISTRICT—PHILADELPHIA 1861.

## Williamson *versus* Lewis.

*Writ of* Habeas Corpus, *who entitled to under Act of* 1785.—*By whom issued.*—*Penalty for Refusing when incurred.*— *Writ at Common Law, and by Statute, distinguished.*

1. Persons restrained of liberty on any bailable criminal charge, are, on showing this fact, entitled to a *habeas corpus*, under the provisions of the *Habeas Corpus Act*, issued by a court or a single judge thereof, in order that they may be admitted to bail to appear and be tried in due course, or that they may be discharged, if no sufficient cause of detention appear: and they may have redress for breaches of this right, by means of the penalties prescribed in the act.

2. Persons restrained of their liberty by private force or authority, under any pretence whatsoever, have the same right to the writ under the *Habeas Corpus Act*, in order that they have proper relief, and the same redress for breaches of this right.

3. The act does not require a court or a single judge to issue a *habeas corpus*, where the party is detained on a criminal charge not bailable, or on civil process, or any judgment, decree, sentence, or conviction, including convictions for contempt; though even in these cases the common law allows the writ out of the proper court.

4. All cases of *habeas corpus*, other than those provided for in the *Habeas Corpus Act*, are merely common law forms of the remedy, and are to be granted and enforced according to the common law, and not under the provisions and penalties of the act.

5. A single judge of a state court is not liable to the penalty of the statute, for refusing to issue a *habeas corpus* in favour of one who stands committed by a Federal court for a contempt: because the statute does not require its issue in such a case.

(9)

[Williamson *v.* Lewis.]

CERTIFICATE from the Court at Nisi Prius.

This was an action of debt, brought by Passmore Williamson against Ellis Lewis, late a Judge of the Supreme Court of Pennsylvania, to recover the penalty of three hundred pounds, given by the 13th section of the Act of February 18th 1785, for refusing to grant him a writ of *habeas corpus*. The case was this :—

On the 18th day of July 1855, the petition of John H. Wheeler was presented to the Hon. John K. Kane, of the District Court of the United States, in and for the Eastern District of Pennsylvania, setting forth that he was the owner of Jane, Daniel, and Isaiah, three coloured persons held to service or labour by the laws of the state of Virginia, and that they were detained from his possession by Passmore Williamson, the plaintiff in this action, and praying the said judge to grant a writ of *habeas corpus* to be directed to the said Passmore Williamson, commanding him to bring before the said judge the bodies of the said Jane, Daniel, and Isaiah. A writ of *habeas corpus*, and afterwards an *alias* writ of *habeas corpus*, were issued out of the said court, to the said Passmore Williamson directed, commanding him to bring the bodies of the said Jane, Daniel, and Isaiah before the said the Hon. John K. Kane, judge as aforesaid; which was so proceeded in, that afterwards, to wit, on the 27th day of July 1855, it was ordered and adjudged by the said court, that the said Passmore Williamson be committed to the custody of the marshal without bail or mainprise, as for a contempt in refusing to make return to the writ of *habeas corpus* theretofore issued against him at the instance of the said John H. Wheeler.

On the 31st day of July 1855, in vacation time and out of term, while he stood committed to the custody of the marshal of the Eastern District of Pennsylvania, and was detained in the jail of the city and county of Philadelphia, under a warrant of commitment as for a contempt in refusing to make return to the said writ of *habeas corpus* theretofore issued against him at the instance of the said John H. Wheeler, and not for treason or felony, he complained to the defendant, he being a judge of the Supreme Court of Pennsylvania, and caused him to view a true copy of the said warrant of commitment and detainer, and made request in writing in due form of law by petition, to which were annexed a copy of the said warrant of commitment and of the record of proceedings upon which it was issued, praying the said defendant, judge as aforesaid, to award and grant a writ of *habeas corpus* according to the Act of Assembly in such case made and provided, so that the said Passmore Williamson might be brought before the said defendant, then being judge as aforesaid, to do, submit to, and receive what the laws might require.

[Williamson v. Lewis.]

On the next day, to wit, on the 1st day of August 1855, the defendant refused the writ of *habeas corpus* as prayed for, whereupon this suit was brought.

The declaration was in debt. It stated in substance, that the plaintiff, on the 31st day of July 1855, in vacation time and out of term, stood committed to the custody of the marshal of the Eastern District of Pennsylvania, and was detained in the jail of the city and county of Philadelphia under a warrant of commitment, issued by the Hon. John K. Kane, judge of the District Court of the United States for the Eastern District of Pennsylvania, as for a contempt in refusing to make return to a certain writ of *habeas corpus* theretofore issued, against the said plaintiff, out of the said District Court of the United States, at the instance of one John H. Wheeler, and being so committed and detained, the plaintiff did complain to the said defendant, being a judge of the Supreme Court as aforesaid, praying the said defendant to award a writ of *habeas corpus* according to the provisions of said Act of Assembly, so that the said plaintiff might be brought before the said defendant, to do, submit to, and receive what the laws might require; and that the said defendant, not regarding the duties of his office, refused to award the said writ of *habeas corpus*, contrary to the Act of Assembly aforesaid, whereby the said defendant forfeited the sum of three hundred pounds, and an action had accrued to the said Passmore Williamson, being the party aggrieved, to demand and have from the said defendant the said sum of money; and that although often requested so to do, the defendant had not paid the said sum of money, but had refused so to do, to the damage, &c.

The defendant pleaded the general issue.

The case came on to be tried on the 14th December 1858, before his Honour Chief Justice Lowrie. The plaintiff gave in evidence the record of the District Court of the United States for the Eastern District of Pennsylvania, duly authenticated and certified according to law, being the record of the petition of John H. Wheeler for the writ of *habeas corpus*, the decree of the court awarding the same, and the order that the plaintiff stand committed for not making return thereto, and the warrant of commitment directed to the marshal of the Eastern District of Pennsylvania, and his warrant to the keeper of the jail. It was admitted by the counsel for the defendant that upon July 27th 1855 the said plaintiff was taken in custody by the marshal aforesaid under the said warrant, and by him detained in the jail of Philadelphia county. The counsel for the plaintiff further gave in evidence, the petition of the plaintiff addressed to the defendant, praying that the writ of *habeas corpus* might issue on his behalf, the said petition having thereto annexed a copy of the said record, and warrant of commitment; and also the order

[Williamson *v.* Lewis.]

of said Ellis Lewis, refusing to grant said writ of *habeas corpus*, endorsed on said petition, together with his reasons therefor, stated in his opinion thereto annexed; the counsel for the plaintiff and for the defendant agreeing that said plaintiff should not be prejudiced by the statement in said opinion of the waiver of the writ of *habeas corpus*, the said Ellis Lewis not meaning or desiring to rely on that defence so far as respected this trial. And it was also admitted that the said petition signed by the said plaintiff was presented to said defendant, and also at the time thereof that the said plaintiff was detained in custody as in his petition alleged. The plaintiff here closed.

On motion of defendant's counsel, the learned judge directed a nonsuit, to which direction the plaintiff excepted, and asked a certificate to the court in banc, and assigned the following specification of error :—

"The learned judge erred in directing a nonsuit to be entered."

*Edward Hopper*, *P. McCall*, and *Wm. M. Meredith*, for plaintiff in error.—Under the Act of 1785, the defendant had no discretion whatever in the case, but was required, by the plain and imperative language of the law, to issue the writ : his discretion did not commence until the plaintiff in this action should be brought before him on the writ so issued. The only question that can be raised is, whether the Act of 1785 applied to plaintiff's case, he standing committed by Judge Kane as for a contempt in not making return to the writ issued at the instance of John H. Wheeler. If plaintiff had a right to apply for the writ, the forfeiture has been incurred—if not, the defendant is entitled to judgment.

The writ of *habeas corpus* was a writ of right at the common law. The statute 31 Car. 2 and the statute 56 Geo. 3 only facilitated the exercise of that right.

The differences between the writ of *habeas corpus* under the statute 31 Car. 2 and at the common law are pointed out by Lord Eldon in Crowley's Case, 2 Swanst. 12.

Wherever the Habeas Corpus Act applies, it is a writ of course. The judge cannot refuse it *salvo juramento suo.* What is to be the consequence of granting it is another question.

The allowance of the writ in vacation by a single judge is a *ministerial* act. The judge does not act in a judicial capacity. He is merely the particular minister pointed out by law to whom application for the writ is to be made: Yates *v.* Lansing, 5 Johns. 296, 297 ; Hawkins's Pleas of the Crown, vol. 2, p. 144, book 2, ch. 15.

We are not aware of any adjudication to the effect that a judge in vacation has any discretion to refuse the writ, if the Habeas Corpus Act applies to the case.

[Williamson *v.* Lewis.]

Lord Kenyon, in Rex *v.* Flower, 8 T. R. 314, 27 State Trials 986, was of opinion that the court was bound to grant the writ, even when it was moved for in term time.    It is true that it was otherwise said in Hobhouse's Case, 3 B. & Ald. 420, Best, J., saying that in cases which come under the statute a single judge may perhaps be obliged to grant the writ as of course, but in no other.    But in that case the writ had been granted and the prisoner remanded on the return.

The cases which have been referred to in support of the discretion of the single judge will be found upon examination to be cases of *habeas corpus* moved for in term time.

Thus, Marsh's Case, in 3 Bulstr. 27, was long previous to 31 Car. 2.    Schiever's Case, 2 Burr. 765, and the case of the three sailors, 2 Bl. R. 1324, were both cases of prisoners of war, common law writs moved for in term time, and not within the stat. 31 Car. 2, though they would have been within our Act of 1785, and would now be within the statute 56 Geo. 3.

Nor is the case Ex parte Lawrence, 5 Binn. 304, any authority to the contrary, for there the application was made to the court in term time, and not to a judge in vacation.

By the 7th section of the act relative to the jurisdiction and power of the courts, P. L. 787, the judges of the Supreme Court have authority, when and as often as there may be occasion, to issue writs of *habeas corpus, certiorari,* and writs of error; and the 8th section provides that all the writs shall be granted of course.    A special *allocatur,* however, is still necessary to a *certiorari* in a criminal case, as was held in Commonwealth *v.* McGinnis, 2 Wh. 113.

The *habeas corpus* asked for by the plaintiff was under the Act of 1785, and not at common law.

The question whether in Pennsylvania a single judge, in vacation, has any common law power to grant a *habeas corpus;* in other words, whether the common law writ is not confined to the court in term time, has never been decided.

In England it was long considered doubtful whether at common law a judge in vacation could issue the writ: Coke 2d Inst. 53; Hale, Pleas of the Crown, vol. 2, p. 147.    The majority of the judges who were consulted by the House of Lords in 1757, 4 Bac. Abr. 593, and Lord Eldon who made an elaborate investigation of the whole subject in Crowley's Case, 2 Swanst. 1, were of opinion that the common law writ could only issue from the common law courts in term time, and it was not till Leonard Watson's Case, 9 Ad. & Ell. 721, that the right of a judge in vacation to award the writ, returnable in vacation, was affirmatively decided in England.

In this state there is no decision on the point.    Supposing, however, that in Pennsylvania a single judge may issue a *habeas*

*corpus* at common law, in vacation time, Mr. Williamson's case fell within the scope of our Act of 1785.

The 1st section gives the writ to persons committed or detained for any criminal or supposed criminal matter other than treason or felony. The 13th section extends it to persons not committed or detained for any criminal or supposed criminal matter, confined or restrained of their liberty under any colour or pretence whatever.

It will not be amiss here to bring to view the difference between our act and the statute 31 Car. 2. The 1st section of our statute is borrowed mainly from the 2d and 3d sections of 31 Car. 2. It is observable, however, 1. That the words "other than persons convict or in execution by legal process" in the British statute, which limit and restrain the generality of the persons standing committed for criminal or supposed criminal matter, who may apply in vacation time to a judge for this writ, are omitted in our statute. 2. By our act, the return may, by leave of the judge, be amended, and suggestions may be made against it, that thereby material facts may be ascertained, and the judge be enabled by investigating the truth of the circumstances to determine whether the prisoner ought to be bailed, remanded, or discharged, which provision is not contained in the British statute. 3. The provisions of our act are by the 13th section extended to all cases where any persons not being committed or detained for any criminal or supposed criminal matter are restrained of their liberty under any colour or pretence whatever. This provision is not contained in the 31 Car. 2.

Our statute is more extensive in its remedial operation than the 31 Car. 2. The preamble shows that it was intended easily and speedily to redress all wrongful retraints of personal liberty.

It may be said that the Act of 1785 does not apply in the case of commitments in execution; and that the commitment in the present case being as for a contempt was a commitment in execution.

It is unnecessary for the plaintiff to maintain that the Act of 1785 extends to commitments in execution, but it is by no means clear that it is confined to commitments for trial. It might be fairly contended that the act applies to all cases of illegal restraint from whatever cause; and that in all cases where the prisoner stands committed for criminal or supposed criminal matter, it is the duty of the judge to issue the writ, and on its return to investigate the truth of the case, and to determine whether according to law the prisoner ought to be bailed, remanded, or discharged.

The duty of the judge to award the writ is one thing. The duty to remand where it appears from the return that the pri-

[Williamson v. Lewis.]

soner is confined in execution of the sentence of a court of competent jurisdiction is quite another thing, and results from the established rule that the judgment of a court of competent jurisdiction cannot be collaterally investigated. But it by no means follows as a corollary from this rule that a prisoner in execution is not entitled to his *habeas corpus* under our statute.

The omission from our statute of the important words in the statute 31 Car. 2, "other than persons convict or in execution by legal process," is very significant.

The leaning of judicial opinion, so far as it may be gathered from the books, is in favour of the idea that our statute extends to all cases of illegal restraint, whether under commitment for trial or in execution: Hecker v. Jarrett, 3 Binn. 404; Commonwealth v. Lecky, 1 Watts 66; Commonwealth v. Winder, 4 P. L. J. 267; Commonwealth v. Sheriff, 3 Pa. L. J. 375.

Assuming, however, that the Act of 1785 does not apply to cases of commitment in execution by a court of competent jurisdiction, it cannot be doubted that the statute does apply where the committing court has no jurisdiction to commit.

The great object of the statute, the easy and speedy redress of all wrongful restraints upon personal liberty, would have been most imperfectly attained, if illegal imprisonments under usurped authority were beyond the reach of its salutary provisions. The applicability of the act to cases of confinement under void process, whether mesne or final, has never been questioned in Pennsylvania. It *is* clearly alleged in Hecker v. Jarrett and Commonwealth v. Lecky.

1. The commitment in this case was not a commitment in execution, but for a contempt in refusing to make return to the writ of *habeas corpus*, theretofore issued against the plaintiff at the instance of Mr. John H. Wheeler.

It becomes necessary to ascertain with precision the nature of the contempt involved in the refusal to make the return and the nature of the commitment for that contempt.

There are two classes of contempts. First, actual contempt in the face of the court, such as disrespectful or insulting language or behaviour in the presence of the court. And second, constructive contempt by disobedience to the process of the court.

The refusal to make return to a writ of *habeas corpus*, falls within the latter class. And the regular and only course of proceeding known to the law in such case, is by attachment, which is not judgment conviction, but merely process to bring in the party to answer for the alleged contempt: In re Stacy, 10 Johns. 328; The King v. Winton, 5 Term R. 88; Jackson v. Smith, 5 Johns. 115.

The mode of proceeding where the party is brought in upon attachment is set forth in Archbold's Practice, vol. 2, p. 300.

[Williamson *v.* Lewis.]

The forms of the proceedings and of the judgment and sentence for contempt, may be seen in 2 Burr. 792, Rex *v.* Beardmore. And in the case of an attachment of witness for disobeying *subpœna*, in Phillips on Evidence, American Notes, vol. 2, pp. 639 to 642. See also 1 Bacon's Abr. 471, 472, title *Attachment*, and Hawkins's Pleas of the Crown, vol. 2, p. 206.

From these authorities it seems clear that the commitment for that species of constructive contempt which consists in not making return to the process of the court, is not commitment in execution, but only to answer interrogatories.

The English practice, as stated in 1 Bac. Abr. *Attachment*, has been adopted in Pennsylvania. See Lessee of Thomas *v.* Cummins, 1 Yeates 40. It is true that in Hummel's Case, 9 Watts 416, interrogatories were not administered; the defendants having come in and put in their answers and defence on oath, stating all the facts and circumstances on which they relied, and also exhibited evidence. In Wallace's Reports 77, there is a case, Hollingsworth *v.* Duane, in which it is said that where a defendant is brought in, he may submit his contempt, or he may demand of the court to have interrogatories put.

The scope of these references is to show that the commitment by Judge Kane was not a commitment in execution, but simply a commitment to answer, which is made clear by the subsequent action of Judge Kane, who discharged Mr. Williamson upon his answers to interrogatories exhibited by the district attorney, by direction of the judge.

2. Supposing the commitment of the plaintiff by the District Court to have been in execution, the court had no jurisdiction to commit, and therefore the commitment was null and void. If it be contended that the question of jurisdiction is settled by the decision in Williamson's Case, 2 Casey 9, we are bound respectfully but earnestly to urge its reconsideration.

The District Court had no jurisdiction of the cause in which the commitment was made.

That the proceedings upon the *habeas corpus* at the instance of John H. Wheeler were *coram non judice*, results from the limited nature of the jurisdiction of the District Court. Being a court not of general, but purely of *limited*, jurisdiction, it possesses no jurisdiction which is not given to it under the Constitution by Acts of Congress.

The power to award the writ of *habeas corpus* by any of the courts of the United States must be given by written law: Per Marshall, C. J., in Bollman & Swartwout's Case, 4 Cr. 94. What Act of Congress, then, gave to the District Court or its judge authority to issue the *habeas corpus* at the instance of Mr. Wheeler? We search the statute book in vain for any such authority.

[Williamson *v*. Lewis.]

The only statutes which give to the District Court of the United States, or to a judge of that court, power to issue a *habeas corpus*, are the Judiciary Act, § 14, and the Act of March 2d 1833, commonly called the Force Bill.

By the Judiciary Act, the court has power to issue writs of *scire facias*, *habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law. Judges of the District Court are by the same act empowered to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment (meaning of course commitments under process), provided that such writs shall in no case extend to prisoners in jail, unless where they are in custody under or by colour of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify. This case is not within any of those clauses.

Under the Force Bill, the District Court may issue a *habeas corpus* in certain cases of persons committed under a state authority by reason of acts done in pursuance of an Act of Congress of the United States. This case does not fall within that clause.

It follows that the court had no jurisdiction to issue the *habeas corpus* at the instance of Mr. Wheeler. Barry *v*. Mercein, 5 Howard 103, is an express adjudication in point. So also Ex parte Everts, 7 Am. Law Register 79. Judge Kane, therefore, had no jurisdiction to issue the writ of *habeas corpus* at the instance of Mr. Wheeler.

The grounds upon which this court in Williamson's Case placed the right of Judge Kane to commit for contempt, were these:—

First. "That the District Court had jurisdiction under the Fugitive Slave Act of 1850, and the writ of *habeas corpus* may be used in aid of this jurisdiction when necessary, by virtue of the 14th section of the Judiciary Act, which empowers all the courts of the United States to issue writs of *habeas corpus* when necessary for the exercise of their jurisdiction;" but this clause of the Judiciary Act contemplates the grant of the writ for the enforcement of jurisdiction in some proceeding or case pending in the court in which the writ is prayed for: Am. Law Register, vol. 7, p. 87.

The only process which the judges of the Federal courts concurrently with the commissioners can issue, is a warrant to seize and arrest the fugitive—not a *habeas corpus* addressed to a citizen who may have the fugitive in his possession or control: Act of Congress, Sept. 18th 1850. In case of rescue or abduction, the court has further power to proceed by indictment against the rescuer or abductor, and on conviction, after trial by jury, to

3 Wr.—2

[Williamson *v.* Lewis.]

inflict imprisonment not exceeding six months, and a fine not exceeding a certain sum.

The mode of proceeding by warrant is expressly defined. The writ of *habeas corpus* is unnecessary for the exercise of the jurisdiction under the Act of 1850: and even if the alleged slaves were fugitives, the District Court would have had no jurisdiction to award the writ against any citizen of Pennsylvania in whose custody they might be. But they were not fugitives. The petition of Mr. Wheeler does not pretend that they were fugitives.

Secondly. "Even if the District Court had not jurisdiction of the *habeas corpus* at the instance of Mr. Wheeler, it nevertheless had jurisdiction to commit for a contempt, because this was a separate proceeding distinct from the matter under investigation."

Supposing that the court had the power to commit for an actual contempt in *facie curiæ*, the commitment shows on its face that it was not of that character, but was for not making return to the writ of *habeas corpus*.

If the court had no jurisdiction to issue the writ, how could it have jurisdiction to punish disobedience to the writ by commitment for contempt? If a judge has no jurisdiction to issue a writ, his issuing it is an act of usurpation: it is an absolute nullity; and all subsequent proceedings to compel obedience to the writ must be equally null and void.

By the Act of Congress of March 3d 1831, "the powers of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transaction, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons to any *lawful* writ, process, order, rule, decree, or command of said courts."

The *habeas corpus* issued in the case was not a *lawful* writ, seeing that the court had no jurisdiction to issue it. Consequently, by the very provisions of the Act of Congress just quoted, the court was disabled from punishing disobedience to it as for a contempt: Hill *v.* Robertson, 1 Strobh. 1; Brass Crosby's Case, 3 Wils. 188; Burdett *v.* Abbott, 14 ·East 149; Houlden *v.* Smith, 14 Q. B. 841; Kearney's Case, 7 Wheat. 42; Ex parte Adams, 25 Miss. 886; Ex parte Hickey, 4 Sm. & M. 751; Alexander's Case, 2 Am. Law Reg. 44; Langdon's Case, 25 Vermont 680; Olmsted's Case, Brightly 1.

The proposition announced for the first time, we believe, by Judge Black, 2 Casey 20, that the conviction of contempt is con-

[Williamson v. Lewis.]

clusive of every fact which might have been urged on the trial for contempt, and among others want of jurisdiction to try the cause in which the contempt was committed, it is respectfully submitted is without any support from the authorities cited by him.

The New York cases growing out of the commitment of Yates by the Chancellor of New York, do not decide that the judgment of the committing court is collaterally conclusive of its jurisdiction: 1 Hill 154; The State v. Woodfin, 5 Ired. 199; Ex parte Summers, Id. 149; Smethurst's Case, 2 Sandf. 724; Lockwood v. The State, 1 Carter 161; The State v. Tipton, 1 Black. 166; Ex parte Adams, 25 Miss. 886; Commonwealth v. Deacon, 2 Wheeler's Crim. Cases 1; Dime's Case, 14 Q. B. 555.

Neither is there any authority for the notion that the question of jurisdiction is for ever closed by the failure of the party to set up the want of jurisdiction in the proceedings whose validity is collaterally impeached.

The rule is universal that defect of jurisdiction is not cured by the presentation of a defence on other grounds; that consent cannot give jurisdiction, and that the want of jurisdiction may always be set up to avoid the operation of a judgment.

Thirdly. "That a state court or judge has no power to issue a *habeas corpus* to deliver a party confined under process of a Federal court, even though the Federal court had no jurisdiction; because it would tend to a collision between the state and Federal authorities."

To this it may be answered, that, however to be regretted would be a conflict between the judicial authorities of the state and Federal government, yet, where it is clear that the Federal court has transcended its jurisdiction by invading the liberty of a citizen of a state, the state court cannot, without abandoning its high duties and responsibilities, refuse to interfere.

For this duty, we have the authority of one of the most learned, wise, and cautious judges that ever adorned the bench, Ch. J. Tilghman in Olmsted's Case above cited; Commonwealth v. Smith, Whart. Dig. 1850, vol. 1, p. 321, Sup. Ct. Penn. Oct. 1809; Ex parte Lockington, Whart. Dig. tit. *Habeas Corpus*, pl. 4; Thomas v. Crossin, 3 Law Reg. 207; Commonwealth v. Fox, 7 Barr 336; Nicholas Lucien Metzgar's Case, 10 Law Reporter 357.

The question has been settled by the Supreme Court of Wisconsin in the matter of Booth & Rycraft, 3 Wisconsin 157, where the court relieved on *habeas corpus* a person confined under sentence of the District Court of Wisconsin, where the record showed on its face that the court had no jurisdiction.   See also Bagnall v. Ableman, 4 Wisconsin 163.

[Williamson *v.* Lewis.]

*St. George T. Campbell* and *Henry M. Phillips,* for defendant in error.—It is not necessary to go into a detailed examination of the contradictory, overruled, and inapplicable decisions and *dicta* cited by the plaintiff. A few well settled principles dispose of the case.

I. The Habeas Corpus Act of 1785 does not apply to cases of imprisonment in execution of sentences after trial and conviction, but was merely intended to relieve against wrongful imprisonment without or before trial.

II. In no case can the writ be used to rejudge the merits of a judgment of a court or judge of co-ordinate jurisdiction. Hume's England, vol. 4, p. 338, 3 Bl. Com. 138, establish the doctrine that the Habeas Corpus Act was intended for cases where "men were in prison without specific charges;" where "persons apprehended on suspicion had suffered long imprisonment without being brought to trial because they were forgotten by the government." Its object was to relieve against "unjust and illegal imprisonment." Our Act of 1785 is substantially a transcript of the English Habeas Corpus Act. The title shows that it was to "prevent wrongful imprisonments." The preamble sets forth that the evil to be remedied was "wrongful restraints." The body of the act applies to "imprisonments on warrants of commitment," and directs the judge or court to discharge the prisoner on bail for his appearance before the court where the offence is cognisable, and certify the recognisance to the court where the appearance is to be made, unless the offence is not bailable. The act authorizes the court or judge to "investigate the circumstances of the case," to "determine whether the prisoner, according to law, ought to be bailed, remanded, or discharged." It is further provided, that in offences "not bailable" the prisoner can have the benefit of the writ only after he shall have remained in prison, without trial, during two terms, through no fault of his own.

A judgment of a court of competent jurisdiction, remaining unreversed, must be received in every other court of co-ordinate jurisdiction as absolutely conclusive of the matters decided. Judgments cannot be rejudged except by the appellate court. The various provisions of the Habeas Corpus Act referred to in the preceding paragraph can have no possible application to imprisonments in execution of sentences after trial and conviction. A prisoner, after trial and conviction, cannot be relieved from imprisonment in execution of his sentence, so long as that sentence remains unreversed, and the offence unpardoned. The plaintiff seems to rely upon a few isolated *words* of the statute, against its plain and obvious meaning, as gathered from its history, the mischief it was intended to remedy, and the general scope of *all* its provisions. . The Constitution provides that " *all*

*prisoners* shall be bailable by sufficient sureties," &c. According to the *letter* of this provision every *convict* in the Penitentiary who is held in execution of his sentence might be released on bail! This provision is quite as comprehensive as the language of the Habeas Corpus Act, but no judge or lawyer ever thought that it was intended to operate on prisoners held *in execution after trial and sentence.* It is needless to cite any other authorities for these principles than the decision of this court in Passmore Williamson's Case, 2 Casey 9, and the cases cited by the judges who delivered opinions in that case. After the careful consideration given to that case we shall not presume that the court desires to re-examine the questions there decided. The views then expressed by this court are not new.

Chitty, in the first volume of his work on criminal law, when speaking of the English Habeas Corpus Act, says that "in the construction of this statute the cases in which it is compulsory on the court or judge to grant a *habeas corpus,* are rather dubious." He then refers to the reported remark of Lord Kenyon, that "the court were bound to grant the writ, and afterwards, having seen the return to it, to remand the prisoner;" but he adds, in refutation of this 'erroneous notion, that "*this supposed obligation to issue a* habeas corpus *thus ineffectually, can only exist when the commitment is so general that the court cannot know its real occasion, from the terms in which it is worded,* for the *courts are not compelled to overrule it without some reasonable ground be shown by affidavit, for their interference;* because, if it were otherwise, a traitor or felon under sentence of death, a soldier or mariner in the king's service," &c. &c., "might obtain a temporary enlargement by suing out a *habeas corpus,* though sure to be remanded as soon as brought up on its return." Mr. Chitty cites, for this doctrine, the case of Hobhouse, 2 Chitty Rep. 207, together with 3 Bl. 132, 3 B. & A. 420. See also Watkins's Case, 3 Peters 201; Chitty's Criminal Law 133; Comyn's Digest, vol. 4, tit. *Habeas Corpus,* C.

III. The Constitution of the United States, adopted in 1788, superseded and annulled the Pennsylvania Act of 1785, so far as the latter countenances any interference with the judgments, sentences, and decrees of the judicial power of the new, independent, and supreme government of the United States.

IV. That the District Court of the United States had jurisdiction to try, convict, and punish Passmore Williamson for contempt of court, and the jurisdiction did not depend upon its power to try and determine any other cause pending before it.

V. That after trial and conviction in a court of the United States, even the question of *jurisdiction* is not examinable by a *state court* or *judge.* The Supreme Court of the United States has been appointed by all the states for the purpose of finally

[Williamson *v.* Lewis.]

settling all rights claimed under the Constitution and laws of the United States, and the jurisdiction claimed by a Federal court under those laws is one of those rights.

It seems to be thought that the United States District Court had no jurisdiction. We reply, that court, although of *limited*, is not of *inferior* jurisdiction, and the rule in respect to it is that if jurisdiction be not alleged in the proceedings, its judgments and decrees are *erroneous*, and may be reversed on *writ of error or appeal; but they are not absolute nullities*, and they *cannot be reversed in collateral actions*, by a party or privy whose duty it was to show the want of jurisdiction on the trial of the original writ: McCormick *v.* Sullivan, 10 Wheat. 192; Kempe's Lessee *v.* Kennedy, 5 Cr. 185; Sheller's Executors *v.* May's Executors, 6 Cr. 267. It is not necessary to show that the proceedings of Judge Kane, in the *habeas corpus* case before him, were within his jurisdiction. It is sufficient that he had jurisdiction to try, convict, and punish Passmore Williamson for contempt of court. This is a separate and distinct matter—a different suit—founded on a different allegation and tried on a different issue, from that involved in the proceedings of the *habeas corpus* case. The only question here (if the state court could settle it) is, had the United States court jurisdiction to try and convict for contempt? It is nothing to the purpose whether the conviction were regular or irregular, just or unjust, erroneous or free from error. The defendant in this suit, acting as a state judge, at his chambers, in vacation, had no right to inquire into any questions of the kind. He was bound to receive the conviction as conclusive. The United States District Court had jurisdiction to try and punish for contempt of court committed by a party to a cause pending before it. If not, the proper tribunal to decide that and all other questions involving a construction of the Constitution or laws of the United States, was the Supreme Court of the United States: Dime's Case, 14 Q. B. 554; Yates *v.* Lansing, 5 Johns. 296; Balt. & Ohio Railroad *v.* City of Wheeling, 13 Grattan 57.

Whatever may be the construction of the Act of 1785, as applied to cases exclusively within state jurisdiction, the adoption of the Federal Constitution, in 1788, creating a federal government, with a federal judiciary having supreme authority over all questions arising under the Constitution and laws of the Union, cuts up its operation by the roots, so far as it is in conflict with the powers of the new government thus established. Williamson's Case, 2 Casey 25, sanctions this principle. It is true that *Acts of Congress* are void if not in accordance with the Federal Constitution, and all courts may so decide, subject to review in the Federal court at Washington. But the judgments and decrees of the Federal tribunals on the construction of the Constitution

[Williamson *v.* Lewis.]

and laws of the Union, are not to be reviewed and reversed in the state courts. The state courts have no more right to reverse them on a question of United States law than the United States courts have to reverse state courts on questions of state law: Mott *v.* Pennsylvania Railroad Co., 6 Casey 32 ; Thomas *v.* Crossen; Carryl *v.* Taylor, 12 Harris 259, affirmed in the Supreme Court of the United States. To give either the power to nullify the decrees and judgments of the other, would inevitably lead to conflict and civil war, and would destroy all uniformity of decision. The remedy for an error on a question of Federal cognisance is a writ of error to the Supreme Court of the United States. A state court cannot nullify the judgment of a District Court of the United States *even on the ground of a want of jurisdiction.* That can be done by the Supreme Court of the United States alone. This very question, if not fully settled before, was certainly put to rest by the decision of the Supreme Court of the United States in Ableman *v.* Booth and The United States *v.* Booth, 21 Howard's U. S. Rep. 523. This decision was given on writs of error to the Supreme Court of Wisconsin, reported in 3 Wisconsin Reports 157, in the matter of Booth & Rycraft, and in 4 Wisconsin Reports 163, in the names of Bagnall *v.* Ableman. And yet these two decisions of a state court thus reversed and annulled in 1858, are cited in 1860 by the counsel of the plaintiff as settling " the right of a state court to reverse a decision of an United States court on an alleged want of jurisdiction" !

VI. That the true construction of the Act of 1785 is, that the court or judge applied to for a *habeas corpus* is not bound to grant the writ where it appears on the prisoner's own application that he is *not* entitled to the relief demanded.

There was a difference of opinion at one time on the question whether the court or a judge was bound to grant the writ of *habeas corpus* if it manifestly appeared, when the application was made, that the prisoner was legally imprisoned and must inevitably be remanded. But the question was settled in England forty years ago, and there never was any serious question about it in Pennsylvania. The King *v.* John Cam Hobhouse, 2 Chitty's Rep. 207, settled it as the true construction of the Habeas Corpus Act, that " the court will not, in the first instance, grant a *habeas corpus* when they see that, in the result, they must inevitably remand the prisoner." This decision was followed in Cobbett's Case, 5 Man. Gr. & Scott 418, and many others.

The Supreme Court, in Passmore Williamson's Case, 2 Casey 16, recognise the existence of this long-settled construction of the statute. See also Keeler's Case, 1 Hempstead 310.

VII. That the construction of the act is the act itself, and no

[Williamson *v.* Lewis.]

judge in vacation, or in term time, is liable to a penalty for acting in conformity to the act, because the penalty is given only to the "party grieved," and only for refusing a writ "required by the act to be granted." In refusing a writ not required by the true construction of the act to be granted, there is neither a party grieved, nor a violation of the act.

The Pennsylvania Act of 1785 is similar to the English statute in excluding two opposite constructions, one for use in term time, and the other to be applied in vacation. Under both statutes the party may "move and obtain" the writ in term time, under the regulations which govern the application in vacation. Conceding that the judges in term time are not liable to a penalty for refusing the writ, this certainly cannot change the true meaning of the act in regard to the party's right to it. The construction being established, no penalty can accrue for conforming to it, because the act gives the penalty only on the refusal to award a writ "required by the act to be granted," and the penalty is given only to the party "grieved." In a case where the party has no right to the writ, there is neither a party "grieved" nor a violation of law, and no right of recovery.

But the judge of the District Court of the United States had the authority to issue this writ, although this question, in the view already presented, is of no practical value. The Fugitive Slave Act, the constitutionality of which even the plaintiff does not assail, imposed upon the judge certain duties, while the 14th section of the Judiciary Act of 1789 (Brightly's U. S. Dig. 301) expressly authorizes the United States courts "to issue writs of *scire facias, habeas corpus*, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law." Whether a *habeas corpus* was proper or necessary in that proceeding, was to be judged by him alone, and that a citizen of Pennsylvania, in whose custody the alleged slaves might be, should be exempt from this process, as is asserted by the plaintiff, is a strange doctrine, novel and not very intelligible. The judge had duties, and by the Constitution of the United States (2 Dall. 410) these were *judicial*, and in exercise of his jurisdiction, he allowed the very writ named by statute as a proper auxiliary.

Since the adoption of the Constitution of Pennsylvania in 1790, a judge cannot be required to perform a ministerial act. Government is divided into three distinct departments, each of which has its appropriate functions. See 2 Dall. 410; Kuhn *v.* The Bank of the United States, 2 Ashmead's Rep. 170; United States *v.* Lawrence, 3 Dall. 42.

If the decision in Hobhouse's Case be correct, it is immaterial whether the writ in this case were asked at common law or under the Act of 1785, so far as regards the right of the judge to

[Williamson v. Lewis.]

refuse it. The application is, however, *sui generis*, certainly not such as is directed by the Act of 1785. Chief Justice Lowrie's reasons, at p. 24 of 2 Casey, show unanswerably that the judge, in granting or refusing a *habeas corpus*, acts judicially and not ministerially.

The opinion of the court was delivered, May 6th 1861, by

LOWRIE, C. J.—The plaintiff was committed to prison by the District Court of the United States, for a contempt of court, in refusing to answer to a writ of *habeas corpus*. And thereupon he applied to the defendant, then Chief Justice of this court, for a writ of *habeas corpus*, and his petition was refused. The plaintiff regards this as an injury to him, and therefore he brings this suit for the penalty prescribed by the Act of Assembly against any judge who shall refuse to issue a *habeas corpus* as " required by the act." He was nonsuited below. Is this error ? In other words, does the act require a judge to issue a *habeas corpus* in such a case ?

We have already decided, not only that the act does not require it of a single judge, but that even this court has not and cannot have any authority to issue such a writ in such a case : 2 Casey 9. We have shown this by reference to the English practice, and especially to the opinions of such eminent English judges as De Grey, 3 Wils. 198 ; Blackstone, Id. 204 ; Wilde, 5 C. B. 418 ; and others, 14 Q. B. 554. And of such eminent American judges as Story, 7 Wheat. 42 ; Kent, 4 Johns. 368–73, 5 Id. 288 ; Gibson, 1 Watts 68 ; and we now add Taney, 21 Howard's U. S. Rep. 523. If, then, this court has no authority to issue the writ when such a case as this is presented to them, it seems too plain for argument, that no single judge of the court could do it, and the law has not been violated.

It is argued that the District Court had no jurisdiction of the case in which the alleged contempt was committed. But that is not the question, and cannot be a question under the Habeas Corpus Act. That act, so far as it relates to criminal matters, requires a writ founded on the warrant of commitment alone ; and all that the judge applied to is required to look at is the warrant. If that shows a cause of commitment that is "bailable," and for which he may take the recognisance of the party to appear and be tried, he is bound to grant the writ ; otherwise, he is not ; and of this he must judge at the peril of the penalty. The act gives him no authority, and especially it does not require him to look back of the warrant to the record on which it is founded ; and therefore, it imposes no penalty for not doing what possibly he might have done, had he inquired beyond the warrant. If the District Court usurped authority in taking cognisance of the case out of which the contempt arose, this plaintiff

[Williamson *v.* Lewis.]

has other remedies; but the Habeas Corpus Act imposes no penalty upon a judge for refusing to inquire and decide that question. The penalty of the act is for refusing to grant this writ in order to admit to bail to appear and answer, where the warrant shows a commitment for a bailable offence.

Whatever we may say about the offence charged in the warrant, certainly it is not bailable, and therefore not provided for by this act, and no single judge had any authority to interfere by *habeas corpus* with the warrant. This is the most obvious and satisfactory ground of the decision in Yates *v.* Lansing, 5 Johns. 288, 9 Id. 421–3; where it was decided that, where the chancellor had committed one for a contempt, and a judge of the Supreme Court had discharged him on *habeas corpus*, a recommitment by the chancellor did not subject him to the penalty which the statute imposes for recommitment. It was not a recommitment contrary to the statute, because the *habeas corpus* and the discharge under it were not authorized by the statute, and were therefore void.

Any one who will take the pains to analyze the Habeas Corpus Act, will readily discover that it excludes all cases of detention on civil process, and includes all cases of detention on a bailable criminal charge, or on any other colour or pretence, that is, in any other manner than by civil or criminal process, that is, by any private force or authority. And so the statutory writ has always been administered.

It was not needed in the case of civil process, because all such detention is by judicial process, mesne or final, and is in the due course of law, and subject to correction by other adequate remedies proceeding in perfect accordance with official harmony and subordination. The statutory writ would be quite disorderly if applied here.

It was not needed in capital or non-bailable offences, because its common law form was quite as adequate for this as was consistent with public safety and order.

It was needed for bailable criminal cases, because it was due to the person charged, that he should not be unreasonably imprisoned, and that he should be promptly admitted to bail, and thus secured a regular trial by due course of law, before the tribunals appointed to try him.

It was needed in cases of private restraints of liberty, because these are not in the due course of law, and the citizen or subject is entitled to a speedy hearing before a judge, that it may be decided whether the restraint of his liberty is rightful or not.

For these two classes of cases only does the *statute* provide; for public restraints on bailable criminal charges, and for private restraints on any pretence whatsoever.

Yet the *common law* efficacy of the *habeas corpus* goes far beyond this; and the writ takes many forms, according to the

[Williamson v. Lewis.]

character of the case to which it is applied. We shall refer to only two of these forms. Much perplexity has arisen in many minds from confounding these with each other, and with the statutory writ, and therefore it is important to distinguish them.

The *habeas corpus cum causa* and the *habeas corpus ad subjiciendum* are both common law writs, and both of them were in past times of very great importance to the rights of persons; and in modern times both of them have lost much of their importance by the gradual substitution of other more convenient forms that have taken their place, as well as by a clearer and firmer recognition of the principles which they were intended to enforce. Both are in fact writs *cum causa*, and yet they are quite different in their application.

The one usually called *habeas corpus cum causa* was a writ issuing out of a superior court to an inferior one, and directed to *the judges* of the latter to remove causes pending before them to be tried in the superior courts. And in old times it was regarded as a most important writ for the security of the subjects, because it secured to them a trial before the most learned and impartial courts, free from the tyranny of personal and local excitements, prejudices, and dislikes, and from the judicial ignorance of inferior tribunals. Its province was at first very indefinite, and hence it was often very abusively applied, to the great injury of private rights, and so as to produce disorder in the administration of justice; and therefore many statutes were passed to restrain its application. Blackstone gives us an adequate, but not a full account of this: 3 Comm. 130.

This form of the writ is seldom used by us now, because it is seldom needed. It is a form of enforcing an undoubted authority over subordinate courts. But some of its principles have passed into, or naturally belong to, the administration of the common law *habeas corpus ad subjiciendum;* because superior courts, in reviewing the commitments of inferior magistrates on this latter writ, do sometimes go back of the commitment, and inquire into the grounds of it and their sufficiency. The power to do this comes from the fact of their superiority, and therefore from common law, and not from the Habeas Corpus Act. They cannot, of course, do so, in relation to commitments by courts that are not their inferiors in the judicial hierarchy; and therefore the superior common law courts never deal so with each other's commitments, or with those of the Court of Chancery. A judge could have no right to issue it so as to violate the due course of law secured by Magna Charta, and with us by our American constitutions: 4 Johns. 368; 3 Wils. 198; 5 C. B. 418; 14 Q. B. 554.

Of course our state courts cannot thus interfere with the acts

of the Federal courts, without violating the due course of law, for they belong to a totally different judicial hierarchy or order. And this does not say that any court may wickedly usurp power with impunity, but only that there shall be no disorderly correction of such usurpations. There are regular remedies for it by action and impeachment, and if these are not sufficient the proper authorities ought to provide others. The Habeas Corpus Act provides none. When a court has authority to send a *habeas corpus* or a *certiorari* to remove a cause and the record of it from an inferior court, to be tried before them, or when they act as superior committing magistrates, they may go back into the evidence on which the commitment is founded, and review that, because of their jurisdiction over the inferior courts and their acts, and because of their general superiority. Where they have no such superiority, they cannot do it. No one will pretend that any state judge or court has this sort of superiority over the Federal courts.

So great was the efficiency of the common law writ (*cum causa* and *ad subjiciendum*) that Mr. Hallam, in his Constitutional History of England, vol. 3, p. 16, thinks we are apt to greatly overestimate the value of the Habeas Corpus Act, because it was merely affirmative of well settled common law principles of right declared in Magna Charta, and often repeated in subsequent statutes. If this be true of the English statute, *it is* much more so of ours, because these principles had been very often declared with us from the very start of the province, and had become much more definitely understood and admitted when our act was passed, than they were at the date of the English statutes.

But this view of Mr. Hallam rests on the very common mistake of considering declarations of principles and rights, as equivalent to settled institutions; whereas, the real force that is to act upon or resist other forces, is in the institution which the principles have produced; as the force of an animal or a tree is in the animal or tree itself, and not in the vital force that produced it. As a matter of fact, the Habeas Corpus Act was greatly needed at the time of its passage (1679), when the friends of liberty and leaders of the people were continually in danger of imprisonment at the pleasure of the king, and by his order or that of his privy council or some member of it. The principle was, indeed, as old in its expression as Magna Charta, that justice by due course of law should be denied to no man; but it lacked the body and force which is imparted only by a firm institution.

Sir Edward Coke, 2 Inst: 186, in treating of commitments by command of the king, spoken of in St. Westm. 1, c. 15, passed in 1275, says this meant by the king "in some court of justice, according to law." But this is a plain anachronism. He is

[Williamson v. Lewis.]

speaking of *his* theory of his country's institutions (which was itself in advance of his times) in explanation of the institutions actually existing three and a half centuries before, when every lord had a castle with a prison in it, and every king might commit when he pleased, according as he himself chose to regard Magna Charta. There was no institution strong enough in itself to protect private rights against the all-embracing and all-powerful institution which was embodied in him.

The fact is plain; the principle needed an institution that was itself firm enough to give it body and force. The courts were not such institutions, for they were mere ministers of the king, appointed during his pleasure, and acting on the received theory of government, that the king was the source of all authority. Both sentiment and logic, therefore, guided them to the conclusion that they could assume no authority contrary to his will. To perform judicial functions well, the courts had to become a real power in the land, based on a firm foundation of its own, and not a mere ministry to other powers.

It was necessary, therefore, that the *habeas corpus* should itself become, as it were, an institution, by taking a firm and definite form, that could not be mistaken, and by being armed with penalties which no judge could resist, and no king could set aside. Thus, too, the courts themselves became more powerful against royal influence. When the law at last required that they should be commissioned during good behaviour, they had little need of the Habeas Corpus Act to secure them against royal interference; but it was still useful, to insure their attention to the demands of suitors. Our respect for the writ of *habeas corpus* depends much more upon the good it has done, than upon its modern efficacy; for, in recent times, it has been in very many cases superseded by other forms of process. Its unobtrusive value in quiet times is seldom thought of, and it works so smoothly that it is scarcely felt. By this and other processes, the ordinary excitements and irregular modes of dealing of private life are easily managed by the courts, when they know how to make proper allowances for the ordinary imperfections of humanity. And, even when judicial questions become the subject of great popular excitement, the difficulty is not so much in the case, as in the presentation of the decision of it in such a way as not to add to the excitement, and endanger the very stability of our most sacred institutions.

Let us now notice the common law *habeas corpus ad subjiciendum*. It has a much broader scope than that form of it which is secured by the Habeas Corpus Act; for it may issue in all sorts of cases where it is shown to the court that there is probable cause for believing that a person is restrained of his liberty unlawfully or against the due course of law. The statutory remedy

[Williamson *v.* Lewis.]

falls far short of this, and we fall into inevitable confusion when we go into the common law province of the writ for the principles that are to rule within its statutory province.

Again, this form of the writ by statute and at common law, is addressed to the *person detaining another*, and not to the judges under whose order, judgment, or warrant, he is detained, commanding him to produce the body, and the cause of his detention. Of course the jailor, keeper, or detainer could show no other cause (except in case of detention by private force) than the warrant of commitment; and the court could have nothing else to decide upon, unless, by reason of their official superiority, they could go back of the warrant, as we have already indicated. When this official superiority exists, they may go back of the warrant, and ought to do so in proper cases. Here, however, the warrant shows a conviction for a proper cause, a contempt of court, and therefore a case not bailable to answer, and therefore a case not within the Habeas Corpus Act. And it is not within the common law of *habeas corpus*, because a judge of a state court, or the court itself, has no such superiority over a Federal court, as would justify him or it in reviewing the conviction. And a Federal court has no such superiority over any state court except to remove causes for trial into a Federal court, where a removal is authorized by Act of Congress.

The fact that the petitioner annexes to his petition both the warrant (which the law requires) and the record on which it is founded (which the law does not require), does not affect the case. The judge, the defendant, could not look at the record, because he had no authority to call for it by *certiorari* or otherwise, and because he could treat nothing as the record except what he had authority to call for as record, and what should be certified to him by the court below as such, and because he had no authority to review the acts of any tribunal that is not his official subordinate. No matter how wrong, and how clearly wrong the District Court may have been in deciding as it did, the state judge could not review his decision by *habeas corpus* without an abuse of the process, and a plain usurpation of power. We need not say that he could or could not have discharged from a warrant void on its face, for this warrant is plainly not so. He could not on the *habeas corpus*, and according to the act, admit the prisoner to bail, because the warrant showed a *conviction*, and therefore not a bailable case.

What we decide is, that—

1. Persons restrained of liberty on any bailable criminal charge, are, on showing this fact, entitled to a *habeas corpus* under the provisions of the Habeas Corpus Act, issued by a court or a single judge thereof, in order that they may be admitted to bail to appear and be tried in due course, or that they

[Williamson *v.* Lewis.]

may be discharged if no sufficient cause of detention appear; and they may have redress for breaches of this right, by means of the penalties prescribed in the act.

2. Persons restrained of their liberty by private force or authority, under any pretence whatsoever, have the same right to the writ under the Habeas Corpus Act, in order that they have proper relief, and the same redress for breaches of this right.

3. The act does not require a court or a single judge to issue a *habeas corpus* where the party is detained on a criminal charge not bailable, or on civil process, or any judgment, decree, sentence, or conviction, including convictions for contempt; though even in these cases the common law allows the writ out of the proper court.

4. All cases of *habeas corpus* other than those provided for in the Habeas Corpus Act, are merely common law forms of the remedy, and are to be granted and enforced according to the common law, and not under the provisions and penalties of the act.

5. A single judge of a state court is not liable to the penalty of the statute for refusing to issue a *habeas corpus* in favour of one who stands committed by a Federal court for a contempt; because the statute does not require its issue in such a case.

                                          Judgment affirmed.